IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| PRUDENCIO CORDOVA, § | | |
| TDCJ-CID #238666, § | | |
| v. § | | CASE NO. 2:11-cv-268 |
| § | | |
| DR. MAXIMILLANO HERRERA, ET AL. § | | |

**MEMORANDUM AND RECOMMENDATION ON**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this civil rights action, Texas state prisoner Prudencio Cordova ("plaintiff") alleges that defendant Dr. Maximiliano Herrera was deliberately indifferent to his serious medical needs when he failed to renew his low-bunk restriction. After his medical restriction expired, plaintiff was assigned to a top bunk and, shortly thereafter, he fell and injured himself.

Dr. Herrera moves for summary judgment to dismiss plaintiff's claims against him in his individual capacity on the grounds of qualified immunity.[1] (D.E. 36, 39). Plaintiff opposes Dr. Herrera's motion. (D.E. 37). For the reasons stated herein, it is respectfully recommended that the Court grant Dr. Herrera's motion for summary judgment, and dismiss plaintiff's claims with prejudice.

**I.   Jurisdiction.**

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.

---

[1]Dr. Herrera also moves for summary judgment to dismiss plaintiff's claims against him in his official capacity. (D.E. 36 at 9 - 10). To the extent plaintiff sued Dr. Herrera in his official capacity for money damages, those claims were previously dismissed as barred by the Eleventh Amendment. (See D.E. 11 at 5 - 6; D.E. 15 at 2).

## II.   Procedural background.

Plaintiff is an inmate in the Texas Department of Criminal Justice, Criminal Institutions Division ("TDCJ-CID"), and is currently incarcerated at the McConnell Unit in Beeville, Texas. He filed his original complaint on August 15, 2011, complaining of Dr. Herrera's failure to renew his top bunk restriction, and alleging also that certain security staff had violated his constitutional rights when they refused to accept the expired medical restriction, and that the McConnell Unit practice manager wrongfully charged him a co-payment for medical visits. (D.E. 1).

A Spears[2] hearing was conducted on September 13, 2011, following which the Court retained plaintiff's deliberate indifference claim against Dr. Herrera in his individual capacity, and dismissed the remaining allegations and defendants. (D.E. 11, 15).

On November 1, 2011, Dr. Herrera filed his answer to plaintiff's complaint and raised the defense of qualified immunity. (D.E. 18).

On February 3, 2012, Dr. Herrera filed the instant motion for summary judgment, (D.E. 36, 39), and on February 10, 2012, plaintiff filed his response in opposition. (D.E. 37).

## III.   Summary judgment evidence.

In support of his motion for summary judgment (D.E. 36), Dr. Herrera offers the following evidence:

    Ex. A:    Affidavit of Dr. Steven Bowers;

---

[2]Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985).

2

> Ex. B, B*: Relevant portions of plaintiff's TDCJ medical records, with business records affidavit;[3] and
>
> Ex. C: Relevant portions of plaintiff's TDCJ grievance records.[4]

The summary judgment evidence establishes the following:

*Plaintiff's testimony.*

Plaintiff testified that, prior to arriving at the McConnell Unit, in April 2001, he was diagnosed with Tinnitus, a condition that causes ringing of the ears, and causes plaintiff to suffer dizzy spells. (D.E. 11 at 3).

After arriving at the McConnell Unit, in June 2004, plaintiff filed a federal lawsuit, Case No. 2:04-cv-328, challenging as unconstitutional his work assignment to the hoe squad. (D.E. 11 at 3). Plaintiff voluntarily moved to dismiss that action upon the representation that he would be evaluated by a physician. Id. Plaintiff was subsequently seen by Dr. Herrera who modified his Health Summary for Classification form, also known as "HSM-18," to limit plaintiff's work assignment to sedentary work only, with no temperature extremes, and no work exposure to loud noises. Id. Plaintiff testified that Dr. Herrera also included housing assignment restrictions of lower bunk only, and bottom row. Id.

---

[3] Portions of plaintiff's medical records were filed under seal at D.E. 39. Plaintiff's medical records filed at D.E. 36 are referred to as "Exhibit B," while those filed under seal at D.E. 39 are referred to as "Exhibit B*").

[4] Reference to Dr. Herrera's summary judgment motion is to "DSJ" (D.E. 36, 39), followed by an exhibit letter and page number, if appropriate. Reference to plaintiff's response (D.E. 37), is to "PR."

3

*Plaintiff's medical records.*

On January 1, 2010, plaintiff submitted a sick call request ("SCR") inquiring about the results of previous lab work and also requesting medication refills. (DSJ Ex. B* at 67).

On January 8, 2010, plaintiff was advised that his prostate-specific antigen ("PSA") was elevated and that he was to be scheduled for an MRI and a referral to urology. (DSJ Ex. B* at 65). On January 10, 2010, plaintiff signed a refusal of treatment form declining a CT scan. Id. at 63, 64.

On February 4, 2010, plaintiff was a no show for an appointment concerning audio referral, neuro consult and CT scan. (DSJ Ex. B* at 61, 62). On February 23, 2010, plaintiff signed a refusal of treatment form declining the medical chain to be transported to Houston Galveston for an ophthalmologists referral based on his complaints of blurry vision and floaters. Id. at 39.

On March 26, 2010, plaintiff submitted a SCR requesting an eye examination and possibly new glasses. (DSJ Ex. B* at 58). On March 27 and 28, plaintiff reported to the infirmary for an eye exam, but he left the clinic both times without seeing a provider. Id. at 56, 57.

On March 30, 2010, plaintiff's HMS-18 was updated by Dr. Stein. (DSJ Ex. B* at 55). Dr. Stein listed no medical restrictions for plaintiff's facility assignment or housing assignment, including no restrictions for row or bunk. Id. However, Dr. Stein continued plaintiff's work restrictions, limiting his job assignments to sedentary work only, no temperature extremes, and no work exposure to loud noises. Id.

On April 22, 2010, plaintiff was seen in the infirmary concerning his elevated PSA. (DSJ Ex. B* at 54). Plaintiff told Nurse Hudson that he had refused to go to Hospital Galveston for further evaluation because he gets very cold and he has no warm clothes, but indicated that he would attend a urology appointment in the warmer months. Id. Plaintiff denied any difficulty with urination. Id. A PSA serum and blood work were ordered. Id.

In later April 2010, while at the Huntsville facility on a bench warrant, G. Perry, completed plaintiff's health status update form and noted noted that plaintiff had no housing restrictions and that his transportation was "routine." (DSJ Ex. B* at 49-50).

On April 28, 2010, at the Huntsville Unit, plaintiff submitted a SCR complaining of cough and congestion. (DSJ Ex. B* st 48).

On May 5, 2010, plaintiff was seen by McConnell Unit medical staff for his "medical and mental health transfer screening." (DSJ Ex. B* at 43-46). Nurse Randell noted that plaintiff's appearance was clean and neat, he was alert, oriented and cooperative, and that no immediate medical referrals were necessary. Id.

On May 7, 2010, plaintiff submitted a SCR complaining about a rash in his throat, difficulty sleeping, fever, shortness of breath, loss of appetite, and discolored urine. (DSJ Ex. B* at 42).

On May 10, 2010, plaintiff was seen in the McConnell Unit infirmary for multiple physical complaints. (DSJ Ex. B* at 40). Upon examination, Nurse Hudson noted that plaintiff's throat was within normal limits and his lungs clear to auscultation. Id. Nurse Hudson's assessment was: kidney stones, elevated PSA, allergies, vertigo, and weight loss.

Id. Nurse Hudson prescribed Sudafed, cranberry juice and increased fluids, abdominal films, blood work, and a urology referral. Id. Nurse Hudson also ordered a lower bunk restriction for the next 90 days. Id. at 38.

On May 14, 2010, plaintiff submitted a SCR complaining that he had not been provided a lower bunk on the bottom floor. (DSJ Ex. B* at 35). Nurse Randell responded that plaintiff had a bottom bunk pass for 90 days. Id.

On June 1, 2010, the radiology report of plaintiff's abdomen revealed that plaintiff's bowel did not appear distended but that the renal outlines could not be adequately visualized. (DSJ Ex. B* at 33).

On June 2, 2010, plaintiff was seen in the infirmary for continuing problems with phlegm, throat, ears, and thick saliva. (DSJ Ex. B* at 31, 32). The provider found that plaintiff's physical exam was normal, and he was advised to drink more fluids and to use the nasal spray previously prescribed. Id. at 31.

On June 12, 2010, plaintiff had a visual acuity test to update his prescription for glasses, following which, he was referred to optometry. (DSJ Ex. B* at 25-28).

Lab work performed on June 24, 2010 indicated that plaintiff's PSA remained elevated. (DSJ Ex. B* at 14).

On August 9, 2010, Dr. Herrera updated plaintiff's HSM-18 and continued for 90 days plaintiff's lower bunk restriction. (DSJ Ex. B* at 11).

On August 23, 2010, plaintiff refused to go to Hospital Galveston for evaluation of his kidneys and bladder. (DSJ Ex. B* at 10).

On September 6, 2010, plaintiff was seen in optometry for new glasses. (DSJ Ex. B* at 8).

On September 17, 2010, plaintiff was seen in the infirmary for complaints of a heat rash. (DSJ Ex. B* at 9, 3-7). The provider diagnosed plaintiff with a fungal foot infection and prescribed an oral medication and topical antifungal cream, and instructed plaintiff on the appropriate care. Id. at 6-7.

On November 8, 2010, Dr. Herrera reviewed and signed plaintiff's updated HSM-18. (DSJ Ex. B at 3). The November 8, 2010 HSM-18 did not provide for a lower bunk restriction. Id.

On November 17, 2010, plaintiff received his new prescription glasses. (DSJ Ex. B at 4).

On December 20, 2010, plaintiff submitted a SCR requesting cold medication. (DSJ Ex. B at 5). He was scheduled to be seen in the infirmary on December 22, 2010, but he failed to show. Id. at 6, 8.

On December 24, 2010, plaintiff submitted a SCR again asking for cold medication and a decongestant. (DSJ Ex. B at 7). On December 28, 2010, he was seen in the infirmary for a stuffy nose. Id. at 9-17. He was prescribed Chlortrimeton for seven days, as well as pain medication. Id. at 15.

On April 6, 2011, plaintiff was seen in the infirmary at approximately 3:38 p.m. complaining that he had fallen from his top bunk, injuring his back and chest. (DSJ Ex. B at 18-20). He was seen by Dr. Herrera who noted that, upon examination, plaintiff was

ambulatory, alert, and in no apparent distress. Id. at 18. Dr. Herrera's assessment was recurrent vertigo, and he order that plaintiff be permanently assigned to a lower bunk, lower row. Id. He also ordered plaintiff Ibuprofen for pain. Id.

On April 7, 2011, plaintiff submitted a SCR indicating that he was continuing to have abdominal pain following the fall and he requested an x-ray to rule out a hernia or a fracture. (DSJ Ex. B at 22).

On April 12, 2011, plaintiff was seen in the infirmary by Nurse Hudson with complaints of abdominal and back pain. (DSJ Ex. B at 23-25). Nurse Hudson noted that, upon palpation of the left dorsal rib cage area, plaintiff experienced severe pain, and he had a tender area to the left of the umbilicus. Id. at 24. Her plan was to rule out a fractured rib, and she ordered an abdomen series and rib x-rays, as well as Tylenol. Id. at 25.

On April 15, 2011, x-rays were taken of plaintiff's abdomen and ribs. (DSJ Ex. B at 26). Plaintiff's abdomen appeared normal; however, films revealed acute fractures through the anterolateral ends of the 9th and 10th ribs. Id.

On April 18, 2011, plaintiff was seen by Nurse Hudson in the infirmary where she informed him of his fractured ribs and indicated that she would attempt to find him a rib belt. (DSJ Ex. B at 27).

On April 22, 2011, plaintiff requested to see his x-rays, and the next day, he reported to the infirmary to review his films. (DSJ Ex. B at 30-31).

On April 29, 2010, plaintiff reported to the infirmary for a follow-up appointment concerning his ribs. (DSJ Ex. B at 35-36). Dr. Whitt noted that plaintiff had failed to appear

for blood pressure checks on April 22 and 24. Id. at 33, 34. Dr. Whitt examined plaintiff's abdomen and reported that there was no evidence of an abdominal hernia. Id. at 35. Dr. Whitt continued plaintiff on Ibuprofen for pain. Id. at 36. She also increased plaintiff's blood pressure medication and ordered that his blood pressure be taken 3-times a week for one month. Id.

On May 5, 2011, plaintiff was seen in the infirmary for complaints of a sore throat and congestion, and he was prescribed fluids and a "cold buster." (DSJ Ex. B at 39).

On May 13, 2011, plaintiff was seen in the infirmary to discuss his recent blood work and lab results, and he was advised that additional testing would be necessary to rule out prostate cancer. (DSJ Ex. B at 40-59, 60-61).

On June 8, 2011, plaintiff was seen in the infirmary complaining that his bottom bunk restriction had been discontinued. (DSJ Ex. B at 62). Dr. Whitt noted that initially, plaintiff had a temporary lower bunk restriction that had expired, but that in April 2011, Dr. Herrera had reordered the lower bunk restriction and made it permanent. Id.

On June 29, 2011, plaintiff reported to the infirmary with a cut to his right eye. (DSJ Ex. B at 65-69). Plaintiff told the provider that he had a dizzy spell and fell. Id. at 66. Plaintiff's wound was dressed and he was released to security with instructions to return the next day. Id. at 68.

On June 30, 2011, plaintiff submitted a SCR complaining about the dizzy spell with fall and he requested treatment. (DSJ Ex. B at 70). Plaintiff failed to show for his appointment scheduled for July 1, 2011. Id. at 72.

9

On July 27, 2011, plaintiff submitted a SCR complaining that the medications he was taking might be affecting his health adversely. (DSJ Ex. A at 73). Plaintiff did not show for his July 28, 2011 appointment, but on July 29, 2011, plaintiff was seen in the infirmary concerning his medications and complained-of side effects such as his feet swelling. Id. at 76-77, 74-75. Plaintiff was counseled on his medications and instructed to keep a log of swelling and contributing factors. Id. at 74.

On August 4, 2011, plaintiff was seen in the infirmary for evaluation of his systolic blood pressure and concerns about edema. (DSJ Ex. B at 79-80). It was noted that plaintiff refused the medical chain for a prostate examination. Id. at 79, 81.

On August 6, 2011, plaintiff was seen in the infirmary complaining of a heat rash to his legs. (DSJ Ex. B at 83-87). Plaintiff was prescribed Hydrocortisone 1% cream and an antihistamine. Id. at 86.

On September 6, 2011, Dr. Whitt refused to see plaintiff concerning his systolic blood pressure and swollen feet because Nurse Hudson addressed those concerns on August 4, 2011. (DSJ Ex. B at 100).

*Plaintiff's grievance records.*

On December 9, 2010, plaintiff filed a Step 1 grievance, Grievance No. 2011062032, complaining that he had been charged incorrectly a co-payment for certain medical visits. (DSJ Ex. C at 8-9). On January 14, 2011, practice manager William Burgin denied the grievance stating that there were no charges for medical care in 2010, and that plaintiff was complaining about dates in 2009. Id. at 9.

On January 20, 2011, plaintiff filed a Step 2 appeal of grievance No. 2011062032. (DSJ Ex. C at 6-7). On April 12, 2011, plaintiff's Step 2 appeal was denied.

On March 30, 2011, plaintiff filed a Step 1 grievance, Grievance No. 2011128952, complaining that Officer Trevino had forced him to accept a top-bunk assignment or be given a disciplinary case. (DSJ Ex. C at 13-14). On May 10, 2011, Warden Davis denied the grievance finding that on November 9, 2010, plaintiff's HSM-18 did not limit plaintiff to a lower bunk only. Id. at 14.

On May 18, 2011, plaintiff filed a Step 2 appeal of Grievance No. 2011128952. (DSJ Ex. C at 11-12). An investigation was conducted. Id. at 10. The grievance investigator noted that medical providers could review and update HSM-18s based on chart review only and were not required to examine the offender at the time. Id. However, if an offender challenged a change to his HMS-18, the offender must be seen by a provider. Id. The investigator found that, in plaintiff's case, on August 9, 2010, Dr. Herrera extended for another 90 days the lower bunk restriction initially ordered by Nurse Hudson on May 10, 2010; however, the restriction automatically expired on November 8, 2010, and Dr. Herrera did not renew or continue it, and plaintiff did not request to be reevaluated thereafter. Id.

### IV.  Summary judgment standard.

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court

must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motions. Caboni v. Gen. Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not weigh the evidence or evaluate the credibility of witnesses. See id. Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify on the matters stated therein." Fed. R. Civ. P. 56(e); see also Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559 (5th Cir. 1992).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(c); Anderson, 477 U.S. at 248-49. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." Caboni, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence . . . a verdict should not be directed." Anderson, 477 U.S. at 250-51.

**V.   Discussion.**

Dr. Herrera moves for summary judgment to dismiss plaintiff's claims against him on the grounds of qualified immunity.

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 230 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense.  McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (en banc).  To discharge this burden, the plaintiff must satisfy a two-prong test." Atteberry v .Nocana Gen. Hosp., 430 F.3d 245, 251-52 (5th Cir. 2005).  First he must claim that the defendants committed a constitutional violation under current law.  Id. (citation omitted).  Second, he must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of.  Id.

While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory.  Pearson, 555 U.S. at 236 (receding from Saucier v. Katz, 533 U.S. 194 (2001)).

*Step 1 – Constitutional violation.*

The Eighth Amendment prohibits cruel and unusual punishment.  U.S. Const. amend. VIII.  Prison officials must provide humane conditions of confinement; ensure that inmates

13

receive adequate food, clothing, shelter, and medical care; and take reasonable measures to guarantee the safety of the inmates. Farmer v. Brennan, 511 U.S. 825, 832 (1994). Conditions that result in "unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities" violate the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1, 8-10 (1992); Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Such such a violation occurs when a prison official is deliberately indifferent to an inmate's health and safety. Farmer, 511 U.S. at 834. Deliberate indifference is more than mere negligence. Id. at 835. To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference. Id. at 837.

In order to state a § 1983 claim for denial of adequate medical treatment, a prisoner must allege the official(s) acted with deliberate indifference to serious medical needs. Estelle v. Gamble, 429 U.S. 97, 105 (1976); Wilson v. Seiter, 501 U.S. 294, 303.(1991); Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991). Deliberate indifference encompasses more than mere negligence on the part of prison officials. It requires that prison officials be both aware of specific facts from which the inference could be drawn that a serious medical need exists and then the prison official, perceiving the risk, must deliberately fail to act. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Furthermore, negligent medical care does not constitute a valid § 1983 claim. Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993). See also Graves v. Hampton, 1 F.3d 315, 319 (5th Cir. 1993) ("[i]t is well established that negligent or erroneous medical treatment or judgment does not provide a basis for a § 1983

14

claim."). As long as medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights. Youngberg v. Romeo, 457 U.S. 307, 322-23 (1982). Finally, active treatment of a prisoner's serious medical condition does not constitute deliberate indifference, even if treatment is negligently administered. See Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999).

There is no genuine issue of a material fact that plaintiff suffers from hypertension and has a reported history of vertigo. (See D.E. 11, DSJ Ex. B and B*). Plaintiff contends that Dr. Herrera was deliberately indifferent to his serious medical needs when he failed to continue his lower bunk restriction on the November 8, 2010 HSM-18. However, the uncontested facts establish that, even though Dr. Herrera did not reinstate the low bunk restriction, there is no evidence that plaintiff was actively complaining of dizziness or vertigo at that time or otherwise making Dr. Herrera aware of a serious medical need that was ignored.

In March of 2010, plaintiff's HSM-18 included medical restrictions for his work assignments; however, no row or bunk restrictions were noted. (DSJ Ex. B* at 55). In April 2010, while on a bench warrant to Huntsville, plaintiff's health status update did not include a row or bunk restriction, and his transportation was noted as "routine." Id. at 50.

On May 10, 2010, plaintiff reported to the infirmary alleging a number of physical complaints, and he was seen by Nurse Hudson who noted plaintiff's symptoms including vertigo and weight loss. (DSJ Ex. B* at 38). Nurse Hudson ordered a lower bunk restriction for 90 days. Id. On May 14, 2010, plaintiff filed a SCR stating that he not been assigned to

a lower bunk on the bottom row. Id. at 35. Nurse Randell responded that same day indicating that plaintiff did have a lower bunk pass for the next 90 days. Id.

Plaintiff's HSM-18 dated August 9, 2010 and approved by Dr. Herrera, continued to reflect that plaintiff had a lower bunk restriction. (DSJ Ex. B* at 11). However, plaintiff's HSM-18 dated November 8, 2010, no longer reflected the bunk restriction, and it was reviewed by Dr. Herrera. (DSJ Ex. B at 3). Following the November 8, 2010 expiration of the lower bunk restriction, plaintiff was seen in the infirmary for new eyeglasses, and also for complaints of cold symptoms. (DSJ Ex. B at 4, 9-17). However, plaintiff did not complain to medical personnel that his lower bunk restriction had expired, nor did he request that the lower bunk restriction be reinstated or reviewed.

It was not until April 6, 2011, when plaintiff suffered from a dizzy spell and fell from his upper bunk, that plaintiff's bunk assignment again became an issue. When plaintiff arrived at the infirmary following his fall, he was seen by Dr. Herrera who immediately ordered that plaintiff be assigned to a lower bunk and bottom row, and he ordered that these restrictions be permanent. (DSJ Ex. B at 18). Prior to that time, plaintiff had not complained about vertigo or dizziness since his May 10, 2010 appointment with Nurse Hudson. (DSJ Ex. B* at 38). Indeed, during this eleven month time frame, plaintiff repeatedly filed SCRs and he was seen in the infirmary on a regular basis, but he did not allege that he was dizzy or suffering from vertigo. Thus, when plaintiff's lower bunk restriction automatically expired on November 8, 2010 and Dr. Herrera failed to renew it, there was no document or record suggesting that plaintiff was currently suffering from dizziness or vertigo.

"Facts underlying a claim of deliberate indifference must clearly evince the medical need in question and the alleged official dereliction." Johnson v. Treon, 759 F.2d 1236, 1238 (5th Cir. 1985). The legal conclusion of deliberate indifference "must rest on facts clearly evincing 'wanton' actions on the part of the defendants." Id. The Supreme Court has described "wanton" actions as those causing the unnecessary infliction of pain. Erickson v. Pardus, 551 U.S. 89, 90 (2007) (per curiam). The fact that Dr. Herrera had examined plaintiff before in connection with his other lawsuit and had previously extended for 90 days his lower bunk restriction does not equate with a finding that Dr. Herrera was intimately aware of plaintiff's serious medical needs 90 days later. Indeed, when Dr. Herrera did not continue the bunk restriction on November 8, 2010, it was in the context of reviewing plaintiff's chart for his HSM-18 update. Plaintiff offers no evidence to suggest that Dr. Herrera suspected or should have suspected that he was continuing to suffer from vertigo on November 8, 2010, and there is nothing in the medical file to suggest so.

Dr. Bowers, a licensed doctor and the legal coordinator and director of continuing medical education for the University of Texas Medical Branch, Correctional Managed Care, testifies that he has reviewed plaintiff's medical records and Dr. Herrera's actions, and he concludes:

> I believe any other reasonably well trained physician, under the same or similar circumstances and knowing what the defendant knew at the time, would have provided the same treatment and believed that doing so was responsible and done in good faith.

(DSJ Ex. C, Bowers Aff't at 9).

In his summary judgment response (D.E. 37), plaintiff claims that he "was made to keep begging for his medical restrictions and was exposed to the pains and injury of a fall ...". (PR at 3). However, there is no evidence that plaintiff had to "keep begging" for his restrictions. Indeed, plaintiff took no steps to reinstate the lower bunk restriction after it expired in November 2010. Nor had he complained about dizziness for the eleven months prior to his April 2011 fall, despite the fact that he had been to the infirmary repeatedly for a myriad of other complaints.

Plaintiff was seen promptly each time after submitting a SCR, usually within a day. Indeed, overall, the uncontested facts demonstrate that plaintiff received adequate and timely medical treatment, and that Dr. Herrera and the medical staff were attentive and responsive to his medical needs. There is no evidence that Dr. Herrera took any action to inflict unnecessary pain or suffering upon plaintiff, and as such, plaintiff fails to establish that Dr. Herrera was deliberately indifferent to a serious medical need.

### *Step 2 – objective reasonableness.*

As previously noted, the second step in the qualified immunity analysis is, if a constitutional violation is demonstrated, to examine whether the defendants' actions were nevertheless reasonable under the circumstances of the particular case and under the established law at the time of the alleged violation. Saucier, 533 U.S. at 201. However, where as here, the uncontested summary judgment evidence establishes that Dr. Herrera was not deliberately indifferent to plaintiff's serious medical needs, the Court need not examine whether his actions were reasonable. Id. (if the facts alleged do not establish that the

officer's conduct violated a constitutional right, then the qualified immunity analysis need proceed no further and qualified immunity is appropriate).

## VI. Recommendation.

For the reasons stated above, it is respectfully recommended that the Court grant Dr. Herrera's motion for summary judgment (D.E. 36), and that plaintiff's claims of deliberate indifference against him be dismissed with prejudice.

Respectfully submitted this 16th day of April, 2012.

_____
B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).